UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| REGINA MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 4:08CV00747 FRB |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is on appeal for review of an adverse ruling by the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I.    Procedural Background**

On March 1, 2005, Ms. Regina Miller ("plaintiff") filed an application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act ("Act"), alleging disability as of October 25, 2002. (Administrative Transcript ("Tr.") 47-49.) Plaintiff's application was denied initially, and on July 6, 2005, she filed a request for a hearing before an administrative law judge ("ALJ"). (Tr. 33.) On October 20, 2005, plaintiff appeared and testified at a hearing before ALJ F. Terrell Eckert. (Tr. 228-46.) On July 22, 2006, ALJ Eckert issued his decision denying

plaintiff's application for benefits. (Tr. 11-16.)  On January 3, 2007, the Appeals Council denied plaintiff's request for review of the ALJ's July 22, 2006 decision.  (Tr. 267-68.)  Plaintiff then appealed to the United States District Court for the Eastern District of Missouri.  Based upon a motion for remand made by the Commissioner, the Honorable Audrey G. Fleissig the Court remanded the matter on July 9, 2007 for additional development and hearing. (Tr. 271-79.)

On November 20, 2007, a supplemental administrative hearing was held, this time before ALJ Robert O'Blennis.  (Tr. 341-87.)  On March 13, 2008, ALJ O'Blennis issued his decision finding plaintiff "not disabled."  (Tr. 247-59.)  The instant Complaint followed.[1]

---

[1]In her brief, after noting the ALJ's March 13, 2008 unfavorable decision, plaintiff writes: "Plaintiff filed a request for a review of the hearing decision and the Appeals Council declined to review Plaintiff's matter in a decision dated March 13, 2008. (Tr. 247-59.)" (Brief in Support of Plaintiff's Complaint, Docket No. 16, at 1-2.)

As the Commissioner correctly notes, however, plaintiff's Complaint immediately followed the ALJ's March 13, 2008 decision.  See (Defendant's Brief, Docket No. 19, at 2.)  While the record indicates, as discussed above, that plaintiff requested Appeals Council review following the July 22, 2006 decision, there is no indication in the record that plaintiff requested Appeals Council review of ALJ O'Blennis's March 13, 2008 decision.  Plaintiff, while stating that the Appeals Council "declined to review Plaintiff's matter in a decision dated March 13, 2008," cites to the pages in the record which document ALJ O'Blennis's March 13, 2008 decision.  See (Docket No. 16 at 2.) Furthermore, plaintiff cites the date "March 13, 2008" for both the ALJ's decision and the undocumented Appeals Council decision.

As the Commissioner notes, and plaintiff does not contest, Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case.  See 20 C.F.R. §§ 416.1406 and 416.1466 (2007).  These modifications include, inter alia, the elimination of the request for Appeals Council review.  20 C.F.R. § 416.1466.  That Regulation provides, inter alia, that the ALJ's decision is binding on all parties unless review is sought in Federal District Court; the Appeals Council decides to review the decision on its own motion; or the decision is revised by the ALJ or the Appeals Council.  Id.  The Commissioner notes that plaintiff's Complaint followed the ALJ's March 13, 2008 decision, and makes no

---

## II.  Evidence Before the ALJ

### A.  Medical Records[2]

Records from St. Mary's Hospital indicate that plaintiff was seen on July 22, 1998 due to a "possible stroke" and examined by William R. Dodd, M.D.  (Tr. 137.)  Dr. Dodd noted that plaintiff had a history of seizures and an apparent history of previous lead poisoning as a child.  (Tr. 138, 139.)  It was also noted that her mother had observed her to have slurred speech, (Tr. 138), and she reported having intermittently slurred speech for two weeks.  (Tr. 139.)  It was noted that she was taking Dilantin[3] and Mysoline.[4] (Tr. 138.)  Laboratory tests were done, and a CT of plaintiff's brain was negative.  (Tr. 140; 144-46.)  She was diagnosed with an elevated Dilantin level; told to stop taking Dilantin for two days and then resume it; and to follow up with Dr. Edward Eyerman.  Id.

An August 29, 2001 MRI of plaintiff's brain was basically unremarkable, but did reveal a "rentention cyst or polyp" in the

---

attempt to argue that plaintiff failed to exhaust her administrative remedies.

[2]Medical records generated before plaintiff's alleged onset date (October 25, 2002) and after the date her insured status expired (December 31, 2005) are included in this summary of the medical records.

[3]Dilantin, or Phenytoin, is used to control certain type of seizures, and to treat and prevent seizures that may begin during or after surgery to the brain or nervous system. Phenytoin is in a class of medications called anticonvulsants. It works by decreasing abnormal electrical activity in the brain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682022.html

[4]Mysoline, or Primidone, is used alone or with other medications to control certain types of seizures. Primidone is in a class of medications called anticonvulsants. It works by decreasing abnormal electrical activity in the brain.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682023.html

right maxillary sinus.  (Tr. 157.)

Records from Erin Bakanas, M.D., of SLUCare at Saint Louis University, indicate that plaintiff was seen on July 18, 2002 to establish care.  (Tr. 187-96.)  On her Health History Questionnaire, plaintiff indicated that she had back and leg problems from falls, and arthritis in her back.  (Tr. 189.)  She indicated that she had lead poisoning in September of 1953, and fell down steps on September 30, 1994 and broke her ankle in two places.  Id.  She indicated that she was taking Dilantin, Mysolin, Ampicillin,[5] Folic Acid, and ibuprofen as needed for pain.  (Tr. 191.)  She described a particular day as "work."  (Tr. 192.) Plaintiff indicated that she was working at McDonald's, and that she was happy with her job. (Tr. 187.) Dr. Bakanas indicated that plaintiff's mother was present during the examination, and attempted to do all of the talking.  Id.  Dr. Bakanas wrote that plaintiff had previously worked at a candy company for 13 years, but that she and her mother agreed that this job was better.  Id. Dr. Bakanas indicated that plaintiff had previously experienced an episode apparently related to elevated Dilantin levels, but that plaintiff's mother said it was a stroke.  Id.  Dr. Bakanas noted that plaintiff's mother was worried because the air conditioning was not working at plaintiff's workplace, and she was afraid plaintiff would become dehydrated.  (Tr. 187.)

_____

[5]Ampicillin is a penicillin-like antibiotic.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a685002.html

Upon exam, Dr. Bakanas noted that plaintiff was overweight, but had a normal exam. (Tr. 187-88.) Dr. Bakanas indicated that she had a long discussion with plaintiff and her mother, and reviewed a cooling/hydration strategy which plaintiff understood and seemed able to pursue. (Tr. 188.) It was indicated that plaintiff had a neurologist, and would continue her usual follow up there. Id. Plaintiff was advised to follow up in six months. Id.

On September 27, 2002, plaintiff saw Howard I. Weiss, M.D. with complaints of a headache and stress because of an interview for an upcoming change of jobs, and concern about her blood pressure because she was experiencing eye pressure and bloodshot eyes, and stated that she planned to go to the emergency room for evaluation. (Tr. 152.) Lumbar spine films taken on September 27, 2002 revealed degenerative anterolisthesis of L4 on L5. (Tr. 160.) Dr. Weiss's records also indicate that plaintiff was noted to be doing well on July 17, 2003. (Tr. 151).

Records from St. Anthony's Medical Center indicate that plaintiff was seen in the Emergency Room on September 27, 2002 with complaints of a headache. (Tr. 199.) It was indicated that plaintiff was taking Dilantin, Mysoline, and Folic Acid. (Tr. 200.) The assessment was migraine headache. (Tr. 201.)

On November 6, 2002, plaintiff presented to SLUCare and received a flu vaccine. (Tr. 186.) On December 17, 2002, plaintiff returned to Dr. Bakanas with complaints of intermittent

left sided pain but no history of trauma. (Tr. 185.) It is indicated that plaintiff's mother advised that plaintiff was laid off from her McDonald's job, and that both plaintiff and her mother were trying to figure out what to do next, and were reluctant to allow Dr. Bakanas to seek assistance for them. Id. Upon exam, plaintiff was noted to be obese, and tender along the right belt line. Id. The assessment was left side pain of unknown origin, and situational stress. Id. Plaintiff was given Tylenol for her pain, and advised to follow up in six months. (Tr. 185.)

On June 16, 2003, plaintiff returned to Dr. Bakanas. (Tr. 184.) Plaintiff was tearful, and indicated that her aunt had died the preceding evening after a long illness. Id. Plaintiff indicated that she was still not working. Id. She stated that she walked a lot, but had no other outside activities or interests. Id. She complained of left ankle pain subsequent to a fall in 1994. (Tr. 184.) Upon exam, plaintiff had full active range of motion of the ankle, with no swelling. Id. Dr. Bakanas assessed chronic left ankle tendonitis, and advised plaintiff to continue to use an ACE wrap as needed, to take ibuprofen if there was any swelling, and follow up in six months or as needed. Id.

Plaintiff returned to Dr. Bakanas on November 10, 2003 for general follow up. (Tr. 183.) Dr. Bakanas noted that plaintiff's mother was in the room, and often answered questions before plaintiff. Id. Plaintiff stated that her ankle complaints had resolved. Id. She reported continued unemployment, and stated

that she did a lot of "scrap booking." Id. She was given a flu shot, and advised to follow up in six months. Id.

On March 18, 2004, Dr. Weiss wrote to Dr. Bakanas, indicating that he had been treating plaintiff in conjunction with seizure disorder. (Tr. 150.) Dr. Weiss wrote that plaintiff's seizures were well-controlled, and that she took Dilantin, Folic Acid,[6] and Mysoline. Id. Dr. Weiss noted that plaintiff had a slight leukopenia,[7] which could be due to Dilantin, but that, because the leukopenia was slight and stable, Dr. Weiss did not recommend discontinuing the use of Dilantin. Id.

Plaintiff returned to Dr. Bakanas on April 8, 2004 for a follow up appointment. (Tr. 182.) She reported no major changes since her last visit. Id. She thought she had "hot flashes," but denied chest pain. Id. She reported that she walked two to three times per day, varying from 15 minutes to one hour. Id. She reported being interested in scrap booking, television, and ceramics, and stated that she would like to read more. (Tr. 182.) She reported taking Dilantin and Mysoline. Id. She complained of abdominal pain and tenderness, but examination was normal. Id. The assessment was seizures controlled by medication, and abdominal

---

[6]Folic Acid is used to treat or prevent Folic Acid deficiency. It is a B-complex vitamin needed by the body to manufacture red blood cells. A deficiency of this vitamin causes certain types of anemia (low red blood cell count). http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682591.html

[7] Leukopenia is a condition in which the number of white blood cells circulating in the blood is abnormally low and which is most commonly due to a decreased production of new cells in conjunction with various infectious diseases, as a reaction to various drugs or other chemicals, or in response to radiation exposure.
http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=leukopenia

pain for which colonoscopy may be considered.  <u>Id.</u>  Plaintiff was advised to follow up in six months.  (Tr. 182.)

Plaintiff returned to Dr. Bakanas on September 16, 2004 for a routine examination.  (Tr. 181.)  It was noted that her only complaint was increasing pain upon bending over, stating that her spine arthritis had worsened in the last two weeks.  <u>Id.</u>  It is indicated that plaintiff went to physical therapy and was given stretches, but was afraid she would hurt herself if she did them. <u>Id.</u>  Plaintiff reported that she walked one to three times per day for one hour.  <u>Id.</u>  Upon exam, she appeared well, but was obese. (Tr. 181.)  She had slight discomfort and soreness in her left lower quadrant due to muscle strain.  <u>Id.</u>  She was advised to continue her exercise regimen and watch her diet, and to get a cholesterol screen.  <u>Id.</u>

On January 19, 2005, plaintiff saw Dr. Bakanas for a follow-up visit.  (Tr. 179, 214.)  Dr. Bakanas wrote "[m]other does much of talking - thinking maybe [plaintiff] needs to apply for disability."  <u>Id.</u>  Plaintiff reported that she had an episode of left knee pain and swelling, which resolved after several days. <u>Id.</u>  It is indicated that plaintiff drank at least a pot of coffee per day.  <u>Id.</u>  She was advised to reduce her caffeine intake, and to continue to work on her weight, and follow up in three months. (Tr. 179, 214.)

On March 10, 2005, plaintiff completed a Pain Questionnaire.  (Tr. 91-99.)  Plaintiff indicated that she had pain

-8-

in her knees and back, which was worse when she lifted or stood in one place. (Tr. 91.) She indicated that, on a daily basis, she made her bed, bathed, dressed, and walked. (Tr. 92.) Plaintiff indicated that she felt that walking helped the blood flow in her legs. Id. Plaintiff indicated that she helped her mother with household chores and laundry, and also watched television and read. Id. Plaintiff indicated that she could go out alone, and also indicated that she had hobbies such as collecting baseball memorabilia, watching television, word search puzzles, and painting ceramics. (Tr. 96.) Plaintiff indicated that lifting and bending hurt her back, that squatting hurt her legs, that standing hurt her legs and back, and kneeling and stair climbing hurt her legs and knee caps. (Tr. 97.) She indicated that she could follow written instructions ok, but had trouble with spoken instructions, and also indicated that she got along with authority figures, but did not handle stress or routine changes very well. (Tr. 97-98.)

On April 30, 2005, plaintiff was seen for a neuropsychiatric evaluation by John S. Rabun, M.D. at the West Park Medical Clinic. (Tr. 207-10.) Plaintiff complained of lower back pain, pain in her right knee, and pain in her left ankle, and stated that she had trouble lifting objects because of back pain. (Tr. 207.) Plaintiff reported fracturing her left ankle in 1992 and wearing a soft brace, but that she did not use any device for ambulation. Id. She reported a history of seizures, but was unsure of the frequency of them because she had not had a seizure

in several years.  Id.  Plaintiff reported that her seizures were controlled with Mysoline and Dilantin, and Dr. Rabun noted that the medical records revealed that her seizures were under good control. Id.

Plaintiff reported that she had never been treated by a psychiatrist. (Tr. 207.)  Plaintiff indicated that she did not believe that she had any psychiatric problems.  Id.  Plaintiff reported that she had good days and bad days, and that at times she felt "frustrated and aggravated with herself."  Id.  Dr. Rabun wrote that plaintiff did not report "a lasting change in mood coupled with other symptoms suggestive of depression." (Tr. 207-08.)  Plaintiff did not describe any suicidal or homicidal ideas, reported no negative thoughts about herself, and indicated no change in her appetite, energy or sleep pattern. (Tr. 208.)

Motor exam revealed normal tone and bulk throughout, with no muscle atrophy.  Id.  Dr. Rabun noted that plaintiff complained of pain and tenderness in the left ankle, right knee, and lower back, but had normal range of motion in both elbows, both knees, both ankles, the cervical spine, and lumbar spine, and 5/5 strength throughout.  Id.  Sensory exam and evaluation of plaintiff's coordination were both normal, and Dr. Rabun concluded that plaintiff's neurological exam was free of gross pathology.  Id.

Upon mental status examination, Dr. Rabun noted that plaintiff exhibited no abnormal psychomotor activity; had no disruptions in concentration; had a logical, sequential and goal-

directed flow of thought; and that her thought content did not reveal symptoms of major depression. (Tr. 209.) Dr. Rabun noted that plaintiff related that she liked herself, endorsed no thoughts of hopelessness or worthlessness, and related no features of an anxiety disorder. Id. Dr. Rabun tested plaintiff's memory and noted that she was able to name current and past presidents; to recall three words immediately after five minutes of distraction; and to discuss recent and remote events in her life. Id. Dr. Rabun judged plaintiff's intellectual capacity to be in the low average range, and noted that her insight and judgment were both preserved. Id.

Dr. Rabun concluded that plaintiff displayed no evidence of a neurological or psychiatric disorder that would interfere with her ability to focus, concentrate, and remember instructions. (Tr. 209.) Dr. Rabun concluded that plaintiff "did not display evidence of a neurological or psychiatric disorder that would interfere with her ability to focus, concentrate and remember instructions. She also did not display evidence of a neurological disorder that would interfere with her ability to interact appropriately in a social setting and adapt to changes in a work-like environment." Id. Dr. Rabun assigned plaintiff a Global Assessment of Functioning ("GAF") score of 70.[8] Id.

---

[8]Clinicians use the Global Assessment of Functioning, or GAF, scale to report their judgment of the individual's overall level of functioning. Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n. 2 (8th Cir. 2003) (quoting Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.

On May 6, 2005, Judith A. McGee, Ph.D., completed a Psychiatric Review Technique form. (Tr. 77-90.) Therein, Dr. McGee opined that plaintiff had no medically determinable impairments. (Tr. 77.) Dr. McGee wrote that plaintiff never had psychological treatment, and that she had indicated that she did not have any psychological problems. (Tr. 89.) Dr. McGee noted that plaintiff's thought content did not reveal symptoms of major depression; that she had average intelligence; and that her mental status examination was "ok." Id.

On this same date, a Physical Residual Functional Capacity Assessment form was completed by D. Pfleger, who is listed as a Senior Counselor. (Tr. 69-76.) It is indicated that plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently; could sit, stand and/or walk for six hours in an eight-hour day; and could push and/or pull without limitation. (Tr. 70.) No postural, manipulative, visual, or communicative limitations were established, but it was indicated that plaintiff should avoid concentrated exposure to hazards such as machinery and heights due to her history of seizure activity. (Tr. 71-73.)

On May 23, 2005, plaintiff saw Dr. Bakanas for follow up regarding her blood pressure. (Tr. 214.) Dr. Bakanas noted that

---

Text Revision 2000)); see also Juszczyk v. Astrue, 542 F.3d 626, 628 (8th Cir. 2008). As the Eighth Circuit has recognized, a GAF of 70 "indicates some mild symptoms (such as depressed mood or insomnia) or some difficulty in social, occupational, and school functioning but generally good functioning and some meaningful interpersonal relationships." Sultan v. Barnhart, 368 F.3d 857, 859-60 (8th Cir. 2004.)

plaintiff's mother indicated that plaintiff's first application for disability was turned down, and that they had not decided on their next step.  Id.  Dr. Bakanas noted that plaintiff reported that she still enjoyed walking regularly, and advised plaintiff to engage in regular physical activity.  (Tr. 214-15.)

On September 14, 2005, plaintiff saw Dr. Weiss for a follow-up visit.  (Tr. 312.)  Dr. Weiss noted that plaintiff had experienced no major motor seizures, but had been having some episodes of inattention and agitation.  Id.  Dr. Weiss noted that plaintiff had a normal neurological exam; had normal strength bilaterally; had no tremor; and a steady gait.  Id.  Dr. Weiss wrote "I suggested the possibility of trying a new anticonvulsant medication, but the patient and her mother did not wish to do this."  Id.  Dr. Weiss wrote that there was some question regarding whether plaintiff was having partial seizures, and ordered an EEG (electroencephalogram).  (Tr. 312.)  Dr. Weiss noted that the results would be discussed by telephone, and that plaintiff should follow up with him in one year.  Id.

The record indicates that an EEG was performed at St. Alexius Hospital on September 21, 2005, and was interpreted as an "essentially normal wake and drowse EEG."  (Tr. 316.)

On November 16, 2005, plaintiff was seen by Paul W. Rexroat, Ph.D., for a psychological examination.  (Tr. 217.) Plaintiff reported seizures, a history of lead poisoning, back and leg problems, arthritis of the spine, and ankle problems.  (Tr.

-13-

218.) She reported taking Dilantin, Mysoline, and Folic Acid. Id. Upon examination, plaintiff's affect, range of emotional responsiveness, and energy level were normal. Id. Plaintiff reported occasional mood swings and did not report anxiety as a problem, but stated that she felt more sad than happy. Id. She reported feeling that her life was "not worth it," that she had felt depressed for the last four years; and had financial and transportation problems. (Tr. 218.) She reported almost daily crying spells and occasional suicidal ideation, but no attempts. Id. She had no trouble sleeping, and had a normal appetite. Id.

Dr. Rexroat noted that plaintiff was well-oriented to person, place, time and situation, except that she thought it was a Thursday when it was actually Wednesday. Id. Her immediate memory was 4/4 forward and 3/3 backward, and a delayed memory test revealed that she remembered two out of three objects after a five-minute time period. (Tr. 218.) Plaintiff was able to name current and past presidents, and to identify large U.S. cities. (Tr. 219.) Verbal judgment was good, and she was able to solve most simple problems in all four basic math operations. Id. She had some difficulty with abstract verbal reasoning. Id. Dr. Rexroat estimated plaintiff's I.Q. was in the borderline range. Id.

Dr. Rexroat administered the Minnesota Multiphasic Personality Inventory - II ("MMPI-2"), and noted that it appeared that plaintiff answered randomly to many test items, which caused her profile to appear invalid, and that the analysis of the profile

-14-

should therefore be given little to no weight.[9]  (Tr. 219.)

Dr. Rexroat then analyzed plaintiff's profile, and found that extreme depression, anxiety and feelings of inadequacy may cause difficulty in functioning.  Id.  Dr. Rexroat noted that the resulting impairment may range from diminished activity and decreased motor speed to withdrawal, passivity, and indifference, and that plaintiff may have difficulty concentrating, recognizing alternatives, and reaching decisions.  Id.  He opined that plaintiff's difficulty communicating effectively and assertively may contribute to discouragement, social alienation, and difficulty forming close, satisfying relationships.  Id.  Dr. Rexroat noted that plaintiff appeared to have an issue with feeling pressured, threatened, or mistreated, and that those feelings could be due to current or past experiences.  (Tr. 219.)

Dr. Rexroat noted that plaintiff expressed unusual ideas, perceptions, or experiences, suggesting thought disorder, but wrote that "a general tendency to overstate problems must be considered in evaluating the significance of this information."  (Tr. 220.) Dr. Rexroat also noted that concerns in the area of reasoning and judgment may relate to "oversensitivity, suspiciousness, and adherence to certain convictions and assumptions" which may limit

---

[9]Specifically, Dr. Rexroat wrote: "All test items were read to [plaintiff], but there are indications that she answered randomly to many of the items without regard to their content.  Thus, the profile appears invalid since it has not been computed properly.  Little to no weight should be granted to the following interpretive information, but it is provided for your perusal.  The failure to accurately respond to test items may be due to lack of cooperation, extreme confusion, or lack of comprehension."  (Tr. 219.)

her receptiveness to new experiences, and may lead to feeling slighted or threatened via misinterpretation of other people's words or actions. Id.

Dr. Rexroat wrote that plaintiff expressed a high level of depressive features, suggesting a possible depressive condition, but wrote that this must be evaluated in the context of plaintiff's general tendencies to overstate problems. Id. Dr. Rexroat also noted that the possibility of an anxiety disorder must be carefully evaluated with reference to the broad range of problems reported. Id. Dr. Rexroat noted that plaintiff expressed many health-related concerns, but that she may "develop somatic symptoms in connection with such psychological factors as stress, conflict, emotional experiences, personality, and secondary gains." (Tr. 220.) Dr. Rexroat noted indications of social introversion, and a high level of antisocial characteristics. (Tr. 220-21.)

Dr. Rexroat noted that plaintiff appeared to function in the borderline range of intelligence. (Tr. 221.) He noted that plaintiff was able to understand and remember simple instructions; could sustain concentration and persistence with simple tasks; had mild limitations in her ability to interact socially; and moderate limitations in her ability to adapt to her environment. Id. Dr. Rexroat noted moderate limitations in plaintiff's activities of daily living, and noted that plaintiff dusted, vacuumed, did laundry, and shopped with her mother; did not read much due to migraine headaches; and watched television two to three hours per

day. Id. Dr. Rexroat noted that plaintiff exhibited good social skills while in his office; had one female friend but had lost contact with her few other friends; and felt that she got along well with others. Id. Dr. Rexroat noted moderate limitations in the area of social functioning. (Tr. 221.) Dr. Rexroat noted that plaintiff was able to sustain concentration, persistence, and pace with simple tasks, and that her memory functioning appeared to be in the borderline range. Id. Dr. Rexroat diagnosed plaintiff with recurrent and moderate major depression, and assessed a GAF of 59.[10] (Tr. 222.)

In assessing plaintiff's ability to perform work-related activity, Dr. Rexroat indicated that plaintiff would have marked difficulty with understanding, remembering and carrying out detailed instructions; making judgments on simple work-related decisions. (Tr. 224.) Dr. Rexroat indicated that plaintiff would have slight restrictions in her ability to understand, remember and carry out short, simple instructions. Id. Dr. Rexroat wrote that plaintiff's "estimated borderline intelligence would produce these limitations." Id. Dr. Rexroat indicated that plaintiff would have moderate restriction in the area of interacting appropriately with the public, supervisors, and co-workers; responding appropriately

---

[10]GAF scores of 51-60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Hudson ex rel. Jones, 345 F.3d at 662 n. 2 (quoting Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000)).

to work pressures in a usual work setting; and responding appropriately to changes in a routine work setting. (Tr. 225.) Again, Dr. Rexroat wrote that plaintiff's "estimated borderline intelligence would produce these limitations." Id. Dr. Rexroat indicated that there were no other capabilities affected by her impairment. Id.

On August 16, 2006, plaintiff was seen by Dr. Weiss, and it was noted that she had exerienced no seizures in the last year, and that her medications caused no side effects. (Tr. 313.) It is noted that blood work was normal. Id. Examination was normal, and it was noted that plaintiff's gait was "brisk and steady." Id. She was advised to return in one year. Id. On December 14, 2006, Dr. Weiss wrote that plaintiff had "excellent seizure control" on Dilantin and Mysoline, and that he did not recommend switching to a generic form of these drugs. (Tr. 314.)

The record indicates that, on September 5, 2007, plaintiff was examined and noted to have seizure disorder, and advised to continue taking Dilantin, Mysoline, and Folic Acid. (Tr. 315.) It is indicated that, upon examination, plaintiff had no peripheral edema; had a coordinated and smooth gait; had muscle strength with full resistance to opposition in upper and lower extremities; had an intact recent and remote memory, smooth and clear speech, and smooth and accurate finger-to-nose coordination. Id.

On September 18, 2007, plaintiff was seen by Dale E.

Doerr, M.D., for consultative examination. (Tr. 310-11.)
Plaintiff complained of right knee pain secondary to a fall in
1994. (Tr. 310.) Plaintiff reported that the knee "gives out,"
and that she had been falling recently. Id. Plaintiff reported
pain while walking, ascending and descending stairs, entering and
exiting a car, and rising from a seated position. Id. Plaintiff
denied taking any medication or injections, and stated that she had
been using a brace. Id. Plaintiff denied any numbness or tingling
radiating down the right lower extremity to the foot or toes. (Tr.
310.)

Upon examination, plaintiff's gait and station were noted
to be labored, and she favored the left lower extremity. (Tr.
311.) Dr. Doerr noted +1 joint effusion, full range of motion, and
no instability. Id. Plaintiff was slightly tender over the medial
and lateral joint line, and had 5/5 strength. Id. Dr. Doerr noted
that x-ray of the knee revealed mild patellofemoral degenerative
joint disease. Id. Dr. Doerr recommended further evaluation and
MRI. (Tr. 311.)

On September 26, 2007, Dr. Weiss completed a Physical
Residual Functional Capacity Questionnaire. (Tr. 324-28.) Dr.
Weiss noted that plaintiff had a seizure disorder with a fair
prognosis. (Tr. 324.) Dr. Weiss indicated that emotional factors
contributed to the severity of plaintiff's symptoms and functional
limitations, and that she had anxiety and some cognitive
insufficiency. Id. Dr. Weiss opined that pain and other symptoms

-19-

would frequently interfere with the attention and concentration necessary to perform simple work tasks. (Tr. 325.) Dr. Weiss indicated that plaintiff was incapable of even low stress jobs. Id. Dr. Weiss wrote that plaintiff had "a risk of seizures with personal injury and possible injury to others. She is also on medication that could make her drowsy and cognitively impaired. In addition, she has developed emotional lability with a poor tolerance for stress." (Tr. 328.) Dr. Weiss offered no opinion regarding plaintiff's physical capabilities. See (Tr. 325-28.)

On January 2, 2008, plaintiff was seen by Jack Tippett, M.D., for an orthopedic evaluation. (Tr. 329-40.) Plaintiff reported pain and stiffness in the right knee and ankle; headaches; poor balance; nerves; convulsive disorder, and low back pain. (Tr. 329.) Dr. Tippett noted that x-rays of plaintiff's low back revealed spondylolisthesis at the L4-5 level. Id. He noted that plaintiff was "moderately overweight," had a slow, halting gait, and that, when standing with her eyes closed, seemed somewhat unsteady. Id. Plaintiff could stand briefly on her toes and heels with support, but when asked to squat, plaintiff seemed to try to do so, but never assumed a significant squatting position. (Tr. 330.) Plaintiff seemed to be unable to bend forward at the waist with her knees straight. Id. It was noted that she could dress and undress herself, and could get on and off the examining table with moderate assistance. Id.

Examination of plaintiff's neck revealed some tenderness on the left side near the base, particularly as she tilted from

side to side, and no significant tenderness except, as she tilted to the right side, she complained of soreness in the right flank. <u>Id.</u>  No muscle spasm was noted.  (Tr. 330.)  Examination of plaintiff's shoulders, elbows, wrists and hands revealed normal range of motion throughout.  <u>Id.</u>  There was no tenderness, swelling or instability, and plaintiff had good strength of grasp and normal fine finger motion.  <u>Id.</u>  Examination of plaintiff's hips revealed no significant abnormalities in range of motion, and both hips were stable.  <u>Id.</u>  Examination of the left knee revealed normal range of motion with no tenderness, swelling, or instability, and examination of the right knee revealed no swelling.  (Tr. 330.) There was mild tenderness generally, and the right knee was stable. <u>Id.</u>  It was noted that plaintiff was wearing a brace on the right knee.  <u>Id.</u>  Examination of plaintiff's hips revealed no significant abnormalities in range of motion, and the hips were stable.  <u>Id.</u> Examination of the left ankle revealed moderate thickening compared with the right side, there was no significant ankle motion, and there was some tenderness generally in the left ankle region but no recent swelling.  (Tr. 330.)  The right ankle had essentially normal range of motion with no swelling, tenderness or instability. <u>Id.</u>

Dr. Tippett's impression was internal derangement of the right knee; ankylosis of the left ankle, status 10-12 years following surgical repair of fracture; chronic intermittent headaches; convulsive disorder; chronic low back pain associated

with Grade I spondylolisthesis at L4-5; and hypertension.  _Id._  Dr. Tippett assessed plaintiff's ability to engage in work-related activity, and opined that she could lift and carry up to ten pounds occasionally, but noted that plaintiff had poor balance secondary to low back pain, and had pain and stiffness in her right knee and left ankle.  (Tr. 334.)  Dr. Tippett opined that plaintiff could sit for 30 minutes, and could stand and walk for 10 minutes, without interruption.  (Tr. 335.)  Dr. Tippett opined that plaintiff could sit for eight hours in an eight-hour work day, but could not stand or walk.  _Id._  He opined that plaintiff did not require a cane to ambulate.  _Id._  Dr. Tippett opined that plaintiff could "continuously" reach, handle, finger, feel, and push/pull with her hands bilaterally.  (Tr. 336.)  Dr. Tippett opined that plaintiff could occasionally operate foot controls with her feet bilaterally due to soreness and stiffness in her right knee and left ankle.  _Id._  Dr. Tippett opined that plaintiff could occasionally climb stairs and ramps, but should never climb ladders or scaffolds, or balance, stoop, kneel, crouch, or crawl due to poor balance and stiffness and soreness in the right knee and right ankle.  (Tr. 337.)  Dr. Tippett opined that plaintiff could occasionally tolerate unprotected heights, moving mechanical parts, extreme cold, and operate a motor vehicle, and could frequently tolerate exposure to humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme heat.  (Tr. 338.)  Finally, Dr. Tippett opined that plaintiff could shop, travel alone, ambulate

without assistance, climb a few steps without a hand rail; prepare a simple meal; care for personal hygiene, and sort, handle and use paper and files, but could not walk a block at a reasonable pace on uneven terrain or use public transportation. (Tr. 339.)

      B.   <u>Hearing Testimony</u>

At the hearing on November 20, 2007, plaintiff responded to questions from the ALJ and counsel. Plaintiff testified that she was fifty-seven years old, was right handed, and lived in an apartment with her mother. (Tr. 345.) Plaintiff testified that she had never driven, and that a friend had brought her to the hearing. (Tr. 346.) Plaintiff testified that she graduated from high school, but obtained no further education or training. <u>Id.</u> Plaintiff testified that she last worked at McDonald's as a "lobby lady," which she described as similar to a cleaning lady, but stated that she also made salads and parfaits. <u>Id.</u> Plaintiff testified that she started that job in October of 2001; worked about 30 to 35 hours per week at the rate of at least $6.00 per hour, and was dismissed in 2002. (Tr. 347.) Plaintiff testified that she did not work in 2000 because her mother was sick and required her attention. (Tr. 348.)

Plaintiff testified that she had also worked for Mound City Industries for nine years hand-stamping cigarette packages. (Tr. 348-49.) Plaintiff explained that this job involved standing at a table and using a hot iron to affix tax stickers onto packs of

cigarettes. (Tr. 349.) Plaintiff left this job when the company closed. Id.

Plaintiff testified that she left McDonald's because she was fired, but was not given a reason why. (Tr. 349-50.) The ALJ and plaintiff then had the following exchange:

| | |
|---|---|
| Question<br>(by ALJ): | All right. Did you look for any work after that? |
| Answer<br>(by plaintiff): | That's when my mother started getting sick. |
| Q. | Okay. |
| A. | And I have been taking care of her the best I can. |
| Q. | What kind of care does she require? |
| A. | Well, I mainly do like try to do the best I can with laundry and things like that. |
| Q. | Okay. |

Plaintiff went on to testify that she helped her mother with chores that had to be done, like housework, sweeping, cleaning, and vacuuming. (Tr. 350.) She testified that she did not cook because she did not like "messing around with the stove," and that her mother did the cooking. Id.

Plaintiff testified that she was seeing a neurologist because "I have seizures." (Tr. 351.) Plaintiff then testified that she had her worst seizure in 1974, but did not know if she had had one since then. Id. Plaintiff testified that no one had told her that she has had another seizure, and she has not been

hospitalized for seizure since 1974. <u>Id.</u> Plaintiff testified that she has taken Dilantin and Mysoline for years, and has no side effects. (Tr. 352.) Plaintiff testified that she took no other medications other than a Folic Acid supplement. (Tr. 353.) Plaintiff testified that, while at Mound City, perhaps in 1994, she had a light stroke, and that she assumed it was from being in a hot room with no ventilation. (Tr. 354.) Plaintiff also testified that she sees an internist, Dr. Bakanas, and that the preceding day, had been given two "nerve pills" because plaintiff was nervous about the hearing. (Tr. 354-55.) Plaintiff testified that she had never applied for Medicaid or food stamps. (Tr. 355-56.) Plaintiff testified that she and her mother lived off of their savings, which were dwindling. (Tr. 356.) Plaintiff further testified that she had not applied for free medication. (Tr. 357.) Plaintiff testified that she took Tylenol for headaches. <u>Id.</u>

Plaintiff testified that she had no difficulty taking care of any of her personal needs, but that she had some difficulty getting out of the tub because of "my knee, my ankle." <u>Id.</u> She also feared falling in the shower. <u>Id.</u> Plaintiff testified that she collected baseball cards. (Tr. 358.) Plaintiff testified that she went grocery shopping with her mother, and sometimes went out to eat with a friend. (Tr. 359.) Plaintiff testified that she sometimes stayed inside the house, and sometimes went out for a walk, but "it's getting so dangerous now that I'm almost afraid to do that anymore. I do like to walk." <u>Id.</u> Plaintiff testified

-25-

that she usually walked five to six blocks. (Tr. 360.) Plaintiff testified that she liked to read. (Tr. 362.) Plaintiff testified that she did not have a library card, and had taken the bus in the past when she "had to go to unemployment and that," but was afraid that she would get on the wrong bus and go the wrong way. (Tr. 362.) Plaintiff testified that, a few years ago, she got on the wrong bus, but when she noticed her surroundings were unfamiliar, and got off the bus and found where she should catch the appropriate bus. Id. Plaintiff testified that she had not ridden the bus since this incident. (Tr. 363.)

Plaintiff testified that she could lift a gallon of milk, but that lifting heavy things, like heavy laundry, was difficult. (Tr. 360.) Plaintiff testified that, while at Mound City, she was initially able to lift heavy boxes, but did not do this lifting "towards the end" because of back pain. (Tr. 361.) Plaintiff testified that, while at McDonald's, she did not do much lifting. (Tr. 363-64.)

Plaintiff was then questioned by her attorney.[11] Plaintiff testified that her internist sent her to Dr. Doerr for evaluation of her knee because it was making a popping sound. (Tr. 364.) Plaintiff testified that she got a brace from Walgreen's because she was told she didn't need a heavy brace, and just needed support. (Tr. 364-65.) Plaintiff testified that Dr. Doerr did not

---

[11]In the hearing transcript, it is indicated "EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY." (Tr. 364.) However, the testimony recorded under this heading is plaintiff's testimony under questioning by her attorney.

talk to her about getting an MRI of her knee, despite counsel's notation that the doctor's record indicated that this was discussed. (Tr. 365.) Plaintiff testified that she had trouble with her memory, and that she also had trouble ascending and descending stairs, getting in and out of cars, and rising from a seated position because of her back. (Tr. 365-66.) Plaintiff also testified that her knee popped. (Tr. 366.) Plaintiff testified that she had fallen because of her knee, but did not remember tests being ordered or following up for treatment. Id. Plaintiff's attorney then noted that plaintiff had testified earlier that she had no side effects from medication, and pointed out to her that Dr. Weiss's report indicated that she had side effects. (Tr. 366.) Plaintiff replied that it didn't seem like she did. (Tr. 366-67.) Counsel noted that the doctor said that plaintiff had trouble with feeling tired or drowsy, and plaintiff replied that sometimes she felt that way. (Tr. 367.) Plaintiff testified that she had trouble remembering things that she had just done, and with her memory in general. Id. She testified that she became anxious and nervous, and that the hearing and "the disability in general" had made her "more nervous than anything." (Tr. 368.) Plaintiff explained that she had been upset since 2005 because she did not know what was going to happen. Id.

Plaintiff testified that she never got a driver's license because she never cared to get behind the wheel, and that she was afraid of hurting someone. (Tr. 368-69.) She testified that she

had a fear of riding the bus, and was afraid to go out and walk because she was afraid of certain people. (Tr. 369.) Plaintiff testified that she had never lived away from her mother because she never cared to be on her own, and because her mother needed her help. (Tr. 370.)

Plaintiff testified that she had worked as an assembler in 1988 to 1990. (Tr. 372-73.) Plaintiff testified that her internist did not give her any nerve medication other than the previously-referenced two nerve pills, and further testified that her mother felt that plaintiff did not need them. (Tr. 373.) Plaintiff testified that her mother went to the doctor's office with her. Id. Plaintiff testified that the doctor never suggested before that plaintiff take nerve pills, and testified that the pill had calmed her down a little bit. Id.

The ALJ then heard testimony from Dr. Darrell Taylor, an associate professor at Southern Illinois University, who was called to testify as a vocational expert (also "VE"). (Tr. 380.) Plaintiff's counsel stipulated to Dr. Taylor testifying as an expert. Id. Dr. Taylor testified that plaintiff had worked as a "lobby lady," which was a cleaning type position that also involved food preparation. (Tr. 381.) Dr. Taylor testified that he considered that to be a fast food worker in the light, unskilled category, although plaintiff testified that she periodically lifted boxes weighing over 20 pounds. Id. Dr. Taylor testified that these two jobs were described in the Dictionary of Occupational

Titles ("DOT").  (Tr. 382.)  Dr. Taylor testified that the hand stamping job was a similar position, and that it was at both the light and medium exertional levels.  Id.

The ALJ asked Dr. Taylor to assume a hypothetical person of plaintiff's age, education, and work experience, who could lift 50 pounds occasionally and 25 pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit for six hours; but must avoid jobs that would be dangerous for people who may have a seizure, and must avoid jobs requiring working at unprotected, dangerous heights, and around unprotected, dangerous machinery, alone, around water and/or fire, and required climbing ladders, ropes and scaffolds.  Id.  The ALJ also asked Dr. Taylor to assume that the person should avoid jobs that required understanding, remembering, and carrying out detailed instructions, and that the person had marked limitations in the ability to make judgments on simple work-related decisions, and required simple, repetitive jobs with little change in the work process or work setting.  Id.  The ALJ further specified that the person should avoid jobs requiring close interaction with the public, supervisors and co-workers, should avoid teamwork, and avoid jobs requiring strict adherence to production standards, like assembly line work, but could do jobs allowing flexibility in production pace.  (Tr. 383-84.)  Dr. Taylor clarified that the person was able to perform simple, unskilled work, and testified that if plaintiff's prior work at McDonald's involved only cleaning and working on the salad bar, those jobs

would remain, and that there were light positions available there. (Tr. 384.)

Plaintiff's attorney asked Dr. Taylor to characterize the mental limitations as a person with drowsiness and cognitive impairments resulting from taking medications to control seizures, and "emotionalability" with poor tolerance for stress as a result of this side effect, and Dr. Taylor testified that, if the medication interfered with work-related activities, it would preclude employment. (Tr. 384-85.) Counsel also asked Dr. Taylor whether marked and serious limitation in the area of making simple work-related decisions would preclude simple, repetitive work, and Dr. Taylor replied that it would. (Tr. 385.)

## IV. The ALJ's Decision

In his March 13, 2008 decision, ALJ O'Blennis determined that, based upon plaintiff's earnings record, she acquired sufficient quarters of coverage to remain insured through December 31, 2005, and that she must therefore establish a disability that began on or before December 31, 2005 in order to be entitled to a period of disability and disability insurance benefits.[12] (Tr. 251, 252.) The ALJ found that plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of October 25, 2002 through December 31, 2005 (also "date last insured.") (Tr. 253.) The ALJ found that, during the relevant time

_____

[12]The parties herein do not contest this finding.

period, plaintiff had the medically determinable impairments of degenerative anterolisthesis at L4-5, residuals of a compression fracture of the left ankle since 1994, and a history of seizure disorder, but that her depression was nonsevere while plaintiff had insured status. (Tr. 253, 254-55.) The ALJ found that, during the relevant time period, plaintiff did not have an impairment or combination of impairments of listing-level severity. (Tr. 255.)

The ALJ found that, through the date last insured, plaintiff had the residual functional capacity (also "RFC") to perform medium work as defined in 20 C.F.R. § 404.1567(c)[13], except for working at unprotected heights, with hazardous machinery, or in other hazardous work settings. (Tr. 256.) The ALJ found that plaintiff's past relevant work as a hand stamper and a food preparer and cleaner in a fast food restaurant, which she had performed during the past 15 years at a level above the substantial gainful activity level, did not require the performance of work-related activities precluded by plaintiff's residual functional capacity, and also noted that the VE, Dr. Taylor, testified that these jobs were light, unskilled jobs. (Tr. 258.) The ALJ also noted that plaintiff performed these jobs with precautionary seizure restrictions and with her low-average level of intellectual functioning, and concluded that plaintiff could have performed

_____

[13]Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work. 20 C.F.R. § 404.1567(c).

these past jobs throughout the time she was asserting a disability and had insured status.  Id.  The ALJ concluded that plaintiff was not under a disability, as defined in the Act, at any time from October 25, 2002 through December 31, 2005.  (Tr. 259.)

## V.  Discussion

To be eligible for benefits under the Social Security Act, a plaintiff must prove that she is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace.  See 42 U.S.C. § 423(d)(1)(A).  Specifically, a "disability" under the Act is an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  Id.  The Act further specifies that a person must be both unable to do his previous work and unable, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. §§ 423(d)(2)(A); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Heckler v.

-32-

<u>Campbell</u>, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. <u>See</u> 20 C.F.R. § 404.1520; <u>Bowen</u>, 482 U.S. at 140-42. The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. If the claimant's impairment is severe, the Commissioner then determines whether it meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. <u>Pearsall</u>, 274 F.3d at 1217, <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. §

405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Young o/b/o Trice v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995), <u>citing</u> <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance, but enough that a reasonable person would find adequate to support the conclusion. <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ;

2.    The plaintiff's vocational factors;

3.    The medical evidence from treating and consulting physicians;

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.    Any corroboration by third parties of the plaintiff's impairments;

6.    The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

<u>Stewart v. Secretary of Health & Human Services</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." <u>Groeper v. Sullivan</u>, 932 F.2d

-34-

1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608.
However, where substantial evidence supports the Commissioner's
decision, the decision may not be reversed merely because
substantial evidence may support a different outcome. Jones ex
rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003) (citing
Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)).

To be eligible for disability insurance benefits under
Title II, a claimant must meet the statute's insurance
requirements. Davidson v. Astrue, 501 F.3d 987, 990-91 (8th Cir.
2007) (citing Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997));
42 U.S.C. § 416(i)(2)(C), 416(i)(3)(B). "When an individual is no
longer insured for Title II disability purposes, we will only
consider [her] medical condition as of the date she was last
insured." Id. In this case, because plaintiff's insured status
expired on December 31, 2005, this Court, like the Commissioner,
will consider her condition before that date.

In the case at bar, plaintiff contends that substantial
evidence does not support the ALJ's credibility or RFC
determinations. In support, plaintiff contends that the ALJ failed
to consider plaintiff's subjective complaints in accord with the
Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320,
1321-22 (8th Cir. 1984), and that the ALJ failed to properly
consider the medical opinion evidence of Drs. Rexroat, Tippett,
Doerr, and Weiss, and erroneously relied upon a lay individual's
opinion. Plaintiff also argues that the ALJ failed to offer a

legally sufficient hypothetical question to the vocational expert, and the vocational expert's testimony therefore cannot be said to be substantial evidence. In response, the Commissioner contends that the ALJ properly evaluated and weighed all of the evidence of record, and that his decision is supported by substantial evidence on the record as a whole. For the following reasons, the Commissioner's arguments are well-taken.

    A.   <u>Credibility and RFC Determinations</u>

        The ALJ in this case determined that plaintiff retained the RFC to perform medium work, with certain restrictions as noted, <u>supra</u>, and concluded that her past relevant work as a hand stamper and food preparer/cleaner did not involve work-related activities beyond her abilities. Plaintiff challenges this determination and the ALJ's credibility determination, arguing that the ALJ improperly weighed certain medical evidence. Review of the record, however, reveals that the ALJ properly considered all of the evidence of record, and that substantial evidence supports his credibility and RFC determinations.

        Residual functional capacity is defined as that which a person remains able to do despite her limitations. 20 C.F.R. § 404.1545(a), <u>Lauer v. Apfel</u>, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. 20 C.F.R. §§

-36-

404.1545(a); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995);

Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005).

A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863. The claimant bears the burden of establishing his RFC. Goff, 421 F.3d at 790.

Before determining the claimant's residual functional capacity, the ALJ must evaluate the credibility of the claimant's subjective complaints. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Pearsall, 274 F.3d at 1217.) Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of his alleged physical impairment. Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is

difficult to prove, disprove or quantify their existence and/or overall effect. Polaski at 1321-22. In Polaski, the Eighth Circuit addressed this difficulty and established the following standard for the evaluation of subjective complaints:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

> Id. at 1322.

Although the ALJ is not free to accept or reject the claimant's subjective complaints based upon personal observations alone, he or she may discount such complaints if there are inconsistencies in the evidence as a whole. Id. The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). When an ALJ explicitly considers the Polaski factors and discredits a claimant's complaints for a good reason, that decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective testimony is primarily for

-38-

the ALJ, not the courts, to decide, and the court considers with deference the ALJ's decision on the subject. <u>Tellez v. Barnhart</u>, 403 F.3d 953, 957 (8th Cir. 2005).

The undersigned will first address plaintiff's allegations regarding the ALJ's credibility determination which plaintiff contends was not in accord with the Eighth Circuit's decision in <u>Polaski v. Heckler</u>. Review of the record reveals no error. In discrediting plaintiff's complaints of pain and other symptoms precluding all work, the ALJ did not cite the <u>Polaski</u> decision, but he did cite the Regulations and Social Security Rulings corresponding with <u>Polaski</u> and credibility determination, and wrote that, based thereon, he had considered all of plaintiff's symptoms and the extent to which they could reasonably be accepted as consistent with the evidence of record. (Tr. 256.) The ALJ then set forth numerous inconsistencies detracting from plaintiff's credibility.

The ALJ noted that plaintiff testified that she was able to walk two to three times per day for walks ranging from 15 minutes to one hour, and that she testified that she was able to do housework and go grocery shopping with her mother. Inconsistencies between subjective complaints and daily living patterns diminish credibility. <u>Haley v. Massanari</u>, 258 F.3d 742, 748 (8th Cir. 2001); <u>see</u> <u>also</u> <u>Murphy v. Sullivan</u>, 953 F.2d 383, 386 (8th Cir. 1992) (activities such as housework, grocery shopping, and walking to nearby residences were properly considered as inconsistent with

complaints of disabling pain).

The ALJ also noted that Dr. Bakanas continually recommended that plaintiff exercise, and never prescribed pain medication for back pain, knee pain, or ankle pain. The ALJ specifically noted that, while plaintiff described increased back pain when she saw Dr. Bakanas in September of 2004, she said she was still walking one to three times per day, and no pain medication was prescribed. The lack of strong prescription pain medication supports the ALJ's adverse credibility determination. Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999); see also Murphy, 953 F.2d at 386 (citing Benskin v. Bowen, 830 F.2d 878, 882-83 (8th Cir. 1987) (claimant's testimony about her daily activities, and the lack of strong prescription pain medicine, supported ALJ's adverse credibility determination)). Similarly, the ALJ noted that Dr. Bakanas advised plaintiff to use an over-the-counter ankle brace on her left ankle, and to take over-the-counter ibuprofen if she experienced swelling. Over-the-counter medications are inconsistent with complaints of disabling pain. Loving v. Department of Health and Human Services, Secretary, 16 F.3d 967, 971 (8th Cir. 1994).

The ALJ noted that the medical records from the treating physicians dated during the relevant time period failed to show that plaintiff frequently complained of severe pain or any other problem. The ALJ also noted that, on November 10, 2003, plaintiff told Dr. Bakanas that her left ankle pain had resolved and, when she next saw Dr. Bakanas, she complained of hot flashes, but indicated no complaints of pain. Anderson, 51 F.3d at 780 (citing

Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (allegations of pain can be discredited when no complaints were made about such pain while receiving other treatment)).

In addition, the record contains multiple inconsistencies between plaintiff's testimony and her statements to various physicians. For instance, plaintiff told Dr. Rabun on April 30, 2005 that she did not believe that she had a psychiatric impairment, but months later, told Dr. Rexroat (on November 6, 2005) that she had been depressed for years and cried daily. The ALJ also noted plaintiff's testimony that she left her last job because she was laid off or let go, and there was no indication that she left because she was unable to perform the work due to a physical or mental condition. The ALJ also noted that the date plaintiff was laid off from her McDonald's job was the same date she alleged as the onset of her disability. Finally, during the November 20, 2007 hearing, plaintiff testified that she did not look for work after leaving McDonald's because she had to take care of her mother. (Tr. 350.) Cessation of work for reasons other than a medical condition or disability may properly be considered as weighing against a claimant's credibility. Kelley v. Barnhart, 372 F.3d 958, 961 (8th Cir. 2004); Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir. 1992).

The ALJ further noted that plaintiff's mother had described plaintiff's situational stress to Dr. Bakanas after being laid off from McDonald's; that she and plaintiff were trying to

decide what plaintiff should do next; and that, when plaintiff and her mother saw Dr. Bakanas in January of 2005, plaintiff's mother did most of the talking and opined that plaintiff should apply for disability benefits.  While certainly not dispositive, inasmuch as financial motivation necessarily plays a role in all disability claims, a claimant's financial motivation may contribute to an adverse credibility determination when other factors cast doubt on the claimant's credibility.  <u>Ramirez v. Barnhart</u>, 292 F.3d 576, 582 n 1 (8th Cir. 2002).

Plaintiff briefly contends that the ALJ's decision that "the objective medical evidence was inconsistent with Plaintiff's mother's testimony cannot withstand even minimal scrutiny.  Plaintiff respectfully submits Plaintiff's mother is perfectly capable of making observations relative to her daughter's condition.  Certainly, the recitation relative to third-party observations is legally insufficient in the Eighth Circuit." (Plaintiff's Brief, Docket No. 16, at 17.)  Plaintiff's mother did not testify during the November 20, 2007 hearing, and plaintiff does not specify what "testimony" her mother offered that was improperly considered.  However, the undersigned notes that the ALJ, in his decision, wrote that he was "not persuaded by the statements from the claimant's mother . . . that the claimant is so physically and mentally limited that the claimant is unable to work (Exhibit E.)  [Plaintiff's mother] is a layperson and her opinions are not consistent with the claimant's past work history, the

contemporaneous medical records, or the claimant's actual activities while the claimant had insured status." (Tr. 258.) The "Exhibit E" the ALJ references is found at pages 56-61 of the Administrative Transcript, and consists, <u>inter alia</u>, of plaintiff's mother's unsworn account of plaintiff's seizure disorder, mental problems, and musculoskeletal problems. (Tr. 57-61.)

As the Commissioner correctly notes, the ALJ in this case did not find that plaintiff's mother was incapable of making observations about plaintiff's condition; he found that her statements were not persuasive because they were inconsistent with the plaintiff's past work history, the relevant medical records, and plaintiff's daily activities, essentially the same bases upon which he discredited plaintiff's subjective complaints. An ALJ is free to disbelieve the testimony of a claimant and her witness. <u>Brockman v. Sullivan</u>, 987 F.2d 1344, 1347 (8th Cir. 1993) (citing <u>Basinger v. Heckler</u>, 725 F.2d 1166, 1170 (8th Cir. 1984)). Furthermore, the record is clear that plaintiff and her mother live together. The corroborating testimony of one who lives with the claimant may be discounted by the ALJ, inasmuch as that person has a financial interest in the outcome of the case. <u>Choate v. Barnhart</u>, 457 F.3d 865, 872 (8th Cir. 2006) (citing <u>Rautio v. Bowen</u>, 862 F.2d 176, 180 (8th Cir. 1988)).

Review of the ALJ's decision reveals that, in a manner consistent with <u>Polaski</u>, the ALJ considered all of the appropriate factors and undertook the proper analysis, and properly discredited

-43-

plaintiff's allegations of pain and other symptoms precluding all work. The ALJ's credibility determination is therefore entitled to deference by this Court. Hogan, 239 F.3d at 962; Tellez, 403 F.3d at 957 (the credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the court considers with deference the ALJ's decision on the subject). If an ALJ explicitly discredits a plaintiff's testimony and gives good reasons for doing so, this Court should defer to that determination. See Hamilton v. Astrue, 518 F.3d 607, 613 (8th Cir. 2008); Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).

Plaintiff also challenges the ALJ's RFC determination, arguing that the ALJ failed to properly consider the medical opinion evidence of Drs. Rexroat, Tippett, Doerr, and Weiss. Plaintiff also suggests that the ALJ improperly weighed the assessment performed by the senior counselor. Review of the ALJ's decision reveals no error.

The undersigned will first consider the ALJ's consideration of the opinion of the consultative examiners, Drs. Rexroat, Tippett, and Doerr. Generally, the opinion of a consulting physician who saw the claimant only once does not constitute substantial evidence. Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008); Cox v. Barnhart, 345 F.3d 606, 610 (8th Cir. 2003) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999) (stating that the opinion of a consultative physician does not generally satisfy the substantial evidence requirement)). An ALJ

may reject the opinion of any expert if it is inconsistent with the overall medical record.  Pearsall, 274 F.3d at 1219.

In his decision, the ALJ did not, as plaintiff contends, draw upon his own inferences from Dr. Rexroat's report.  Rather, the ALJ wrote that Dr. Rexroat's opinion was entitled to little weight "for many reasons," and discussed those reasons.  (Tr. 254.) The ALJ noted that Dr. Rexroat credited plaintiff's description of depression with daily crying spells, despite the fact that such statements were inconsistent with the contemporaneous medical records from plaintiff's treating physicians, Drs. Bakanas and Weiss.  The ALJ also noted that Dr. Rexroat's opinion was based upon plaintiff's statements, and that Dr. Rexroat had declared plaintiff's MMPI results invalid due to her random responses and general tendency to overstate her problems.  In addition, it is notable that Dr. Rexroat himself specifically instructed that his interpretation of plaintiff's test results should be given "little to no weight" because of plaintiff's apparently invalid profile. (Tr. 219.)  If justified by substantial evidence in the record as a whole, the ALJ can discount the opinion of an examining physician or a treating physician.  See Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).

Plaintiff also contends that the ALJ erroneously concluded that the opinions of consulting physicians Drs. Tippett and Doerr did not relate back to the insured period.  Addressing

these opinions, the ALJ concluded that the opinions of both Drs. Tippett and Doerr related to plaintiff's current status, and not to her condition before the expiration of her insured status. As noted above, when a person's insured status expires, only her medical conditions as of the date she was last insured are considered. Davidson, 501 F.3d at 990-91 (citing Long, 108 F.3d at 187).

Evidence of a claimant's condition after the expiration of insured status can be probative if it bears upon the severity of the claimant's condition during the relevant time period. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). It is important, however, that the medical evidence relate to the plaintiff's condition during the period of insured status in order to be probative of plaintiff's condition during that time. See Davidson, 501 F.3d at 990 (citing Rehder v. Apfel, 205 F.3d 1056, 1061 (8th Cir. 2000)(non-treating psychologist's report, completed fourteen months after the relevant time period, was not probative of the claimant's condition during the relevant period).

The record indicates that plaintiff experienced an ankle fracture (which was surgically repaired) and injured her knee in a fall in 1994. As plaintiff correctly notes, Dr. Tippett found that plaintiff's ankle was status post fracture for quite some time, and Dr. Doerr noted that plaintiff had undergone ankle surgery, and noted that x-ray showed mild right patellofemoral degenerative joint disorder, and that his impression was right knee lateral

meniscus tear. However, as the ALJ noted, plaintiff worked for a number of years after hurting her ankle and knee, and she failed to prove that an increase in severity of either her ankle or her knoee, or of any impairment whatsoever, caused her to leave her last job, or precluded the performance of her past relevant work while she had insured status. The ALJ also noted plaintiff engaged in extensive daily activities during the time she had insured status, including a significant amount of daily walking, despite the presence of her knee and ankle conditions. In addition, when plaintiff was examined by Dr. Rabun in 2005, she had normal strength and range of motion, and no areas of decreased sensation,[14] and Dr. Bakanas noted that plaintiff complained of some knee pain and later said that it had resolved.

Even if plaintiff had some pain from degenerative joint disease or another condition during the relevant time period, and this condition would likely worsen over time, that does not necessarily mean her condition was disabling before her insured status expired. The contemporaneous medical records simply do not support a conclusion that plaintiff's impairments were severely limiting. The reports of Drs. Tippett and Doerr describe the severity of plaintiff's condition after her insured status expired, and not before. Inasmuch as they do not bear upon the severity of plaintiff's condition during the relevant time period, the ALJ properly found that the reports of Drs. Tippett and Doerr are not

_____

[14]Although Dr. Rabun saw plaintiff for a neuropsychiatric evaluation, he also performed a motor examination. <u>See</u> (Tr. 208).

probative evidence of plaintiff's condition before the expiration of her insured status.

Plaintiff also argues that the ALJ failed to appreciate the restrictions offered by Dr. Weiss. A treating physician's opinion is generally entitled to substantial weight, but it does not automatically control, because the ALJ must evaluate the record as a whole. Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) (citing Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004)). When an ALJ discounts a treating physician's opinion, he should give "good reasons" for doing so. Davidson, 501 F.3d at 990 (citing Dolph v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002). An ALJ can decline to give controlling weight to a treating physician's residual functional capacity assessment that is inconsistent with his or her treatment notes. See Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006).

In his decision, the ALJ wrote that he had considered the September 26, 2007 statement from Dr. Weiss that plaintiff had developed emotional lability with poor tolerance for stress, but noted that the contemporaneous medical records did not document such findings during the time plaintiff had insured status. (Tr. 255.) The ALJ also noted that neither Dr. Weiss nor Dr. Bakanas opined that plaintiff was unable to work during the relevant time period. (Tr. 257.) This is supported by the record.

On July 17, 2003, Dr. Weiss noted that plaintiff was doing well. (Tr. 151.) On March 18, 2004, he wrote to Dr. Bakanas

to advise that plaintiff's seizure disorder was well-controlled with medication. (Tr. 150.) On September 14, 2005, he noted that plaintiff had experienced no major seizures, had a normal neurological examination, normal strength bilaterally, no tremor, and a steady gait. (Tr. 312.) On August 16, 2006 (which is outside the insured period but relevant to the extent it relates to this discussion of Dr. Weiss's September 26, 2007 report), Dr. Weiss noted that plaintiff had experienced no seizures in the last year; had no side effects from her medications; had a normal examination; and had "excellent seizure control." (Tr. 314.) At no time did Dr. Weiss opine that plaintiff should not work, even though he noted, in 2002, that she was anxious due to a job situation.

In sum, Dr. Weiss's treatment notes repeatedly indicate that plaintiff had normal examinations, and never indicated that plaintiff suffered from emotional lability with poor tolerance for stress. In fact, in his treatment notes, Dr. Weiss does not reference a mental impairment. An ALJ can discount a physician's assessment report when his own treatment notes contradict that report. Davidson, 501 F.3d at 990-91. In addition, Dr. Weiss's report is not consistent with the balance of the medical information relating to plaintiff's condition during the relevant time period, which repeatedly documented normal evaluations, a well-controlled seizure condition, no medication side effects, and sparse musculoskeletal complaints. If justified by substantial

evidence in the record as a whole, the ALJ can discount the opinion of an examining physician or a treating physician. See Rogers, 118 F.3d at 602; Ward, 786 F.2d at 846. Finally, Dr. Weiss did not say in his September 26, 2007 report that plaintiff actually did experience medication side effects; he merely said that she was taking medication that "could make her drowsy and cognitively impaired." (Tr. 328.)

Plaintiff also contends that the ALJ's reliance upon a lay individual's medical opinion calls the decision into question. Review of the decision, however, reveals that the ALJ specifically noted that the May 6, 2005 Residual Functional Capacity Assessment form was completed by a lay person, and therefore "does not receive the weight accorded to medical evidence." (Tr. 258.) The ALJ went on to note that the examiner's conclusions were consistent with the evidence of record. The ALJ's treatment of this evidence was proper.

Review of the balance of the ALJ's RFC determination reveals no error. The ALJ noted that plaintiff did not frequently complain of severe pain or any other problem. The ALJ noted that plaintiff had degenerative anterolisthesis of L4 on L5, as indicated on a September 27, 2002 x-ray, but that Dr. Bakanas, plaintiff's treating physician continued to recommend regular exercise and did not prescribe strong pain medication, but instead recommended the at-will use of an Ace wrap and over-the-counter Ibuprofen. The lack of prescription medication is inconsistent

with allegations of disabling impairments.  Rankin, 195 F.3d at 430.  The ALJ noted that there was full active range of motion of the left ankle and no edema on examination, and plaintiff reported walking a lot.  The ALJ also noted that plaintiff told Dr. Bakanas on November 10, 2003 that her ankle pain had resolved, and reported in September 2004 that she had arthritic back pain but was still walking a lot, and no pain medication was prescribed.  While the lack of objective medical evidence to support an alleged disability is not dispositive, it is an important factor, and the ALJ is entitled to consider the fact that there is no objective medical evidence to support the degree of alleged limitations.  See Kisling v. Chater, 105 F.3d 1255, 1257-58 (8th Cir. 1997); Cruse, 867 F.2d at 1186 (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered); Battles v. Sullivan, 902 F.2d 657, 659 (8th Cir. 1990) (ALJ properly denied benefits to claimant who had no medical evidence indicating a serious impairment during the relevant time); Johnson v. Chater, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition; in fact, this was noted to be the "strongest support" in the record for the ALJ's determination).

The ALJ also noted that Dr. Weiss repeatedly indicated that plaintiff's seizure disorder was well-controlled with medication.  When an impairment is controlled by medication or

treatment, it cannot be considered disabling. <u>Schultz v. Astrue</u>, 479 F.3d 979, 983 (8th Cir. 2007). The ALJ also noted that none of plaintiff's impairments precluded her from working for many years at the substantial gainful activity level. A condition that was not disabling during working years and has not worsened cannot be used to prove present disability. <u>Naber v. Shalala</u>, 22 F.3d 186, 189 (8th Cir. 1994) (citation omitted). Furthermore, as noted above, the ALJ had noted that plaintiff apparently left her last job for reasons other than physical or mental inability to do her work. A finding that cessation of work for reasons unrelated to a medical condition militates against a finding of disability. <u>Kelley</u>, 372 F.3d at 961 (citing <u>Browning</u>, 958 F.2d at 823). Finally, plaintiff never sought psychiatric treatment, and took no psychiatric medications. <u>See Jones v. Callahan</u>, 122 F.3d 1148, 1153 (8th Cir. 1997) (substantial evidence supported ALJ's conclusion that claimant did not have severe mental impairment, where claimant was not undergoing regular mental-health treatment or regularly taking psychiatric medications.)

A review of the ALJ's determination of plaintiff's RFC reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence of record as a whole. The ALJ based his decision on all of the credible, relevant evidence of record, and properly weighed all of the medical and other evidence. For the foregoing reasons, the undersigned determines that the ALJ's RFC determination is supported by

substantial evidence on the record as a whole.


   B.   <u>Vocational Expert Testimony</u>

        Plaintiff next challenges the VE's testimony, arguing
that it cannot be considered substantial evidence because it was
based upon a legally insufficient hypothetical.  In support,
plaintiff contends that the ALJ's hypothetical did not capture the
concrete consequences of plaintiff's impairments as evidenced by
Drs. Weiss or Tippett.  The undersigned disagrees.

        "A hypothetical question posed to the vocational expert
is sufficient if it sets forth impairments supported by substantial
evidence in the record and accepted as true by the ALJ."  <u>Hunt v.
Massanari</u>, 250 F.3d 622, 625 (8th Cir. 2001) (citing <u>Prosch</u>, 201
F.3d at 1015).  As explained, <u>supra</u>, substantial evidence supports
the ALJ's RFC and credibility determinations, and the ALJ properly
considered and weighed the opinion evidence of Drs. Weiss and
Tippett.  Likewise, his hypothetical question included all the
impairments he found to be credible.  <u>See Strongson</u>, 361 F.3d at
1072-73 (VE's testimony constituted substantial evidence when ALJ
based his hypothetical upon a legally sufficient RFC and
credibility determination.)  It was permissible for the ALJ to
exclude "any alleged impairments that [he] has properly rejected as
untrue or unsubstantiated."  <u>Hunt</u>, 250 F.3d at 625 (citing <u>Long</u>,
108 F.3d at 187).  In addition, as explained above, it was not
error for the ALJ to discredit those portions of Dr. Weiss's

assessment which were inconsistent with his own treatment notes and with other facts in the record; therefore, the ALJ was not required to present those assessments to the vocational expert. See Rogers, 118 F.3d at 602 (finding the ALJ appropriately weighed the treating physician's opinion and the hypothetical question adequately represented the limitations of the claimant).

Therefore, for all of the foregoing reasons, the Commissioner's decision is hereby found to have been supported by substantial evidence on the record as a whole, and should therefore be affirmed. Because there is substantial evidence to support the decision, this Court may not reverse merely because substantial evidence may support a different outcome, or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir.2001); Browning, 958 F.2d at 821.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be affirmed, and plaintiff's Complaint should be dismissed with prejudice.

_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of September, 2009.